IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Michael Tiquez &                  )
Mara Tiquez,                      )
                               )
    Plaintiffs,            )
                               )
                               )
    v.                    )       No. 25 C 15775
                               )
                               )
Carmen Marine Cooperative    )
*et al.*,                        )
                               )
    Defendants.           )


Memorandum Opinion and Order

Plaintiffs Mara and Michael Tiquez are a mother and son. In response to the deactivation of Mara's apartment keys by Mara's co-op, the Carmen Marine Cooperative ("CMC"), plaintiffs filed this suit against the City of Chicago, two police officers, and several private defendants related to CMC, alleging a harms under constitutional, federal, and state law. Before me are the non-police-related defendants' motion to dismiss. For the reasons that follow, I grant that motion.

1

**I.**

Michael and Mara are proceeding *pro se*, and as I work through their complaint, I am mindful that I must read it generously. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017).[1]

I need to provide some backstory about the Carmen-Marine apartment complex owned by CMC to lay foundation for some of the Tiquezes' arguments, in particular those concerning state action. In the mid-century, the U.S. Department of Housing and Urban Development ("HUD"), through the Federal Housing Administration ("FHA"), provided loans for the construction of thousands of large housing projects, including the Carmen-Marine complex.[2] In exchange for those loans, and until they were repaid, building owners were required to keep rents low and to rent to low-income tenants. The Carmen-Marine complex was funded by one of these FHA loans. When repayment periods on many of these projects were ending,

---

[1] For present purposes, I take the facts in the complaint as true. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

[2] These details are drawn from a report that plays a role in this case and of which I take judicial notice. "Carmen-Marine Apartments, Chicago, IL, Resident Homeownership Program," HUD Office of the Inspector General, Audit Report No. 2015-CH-1010 (Sep. 30, 2015) ("OIG Audit Report"), https://www.hudoig.gov/sites/default/files/documents/2015-CH-1010.pdf.

threatening to reduce the affordable housing stock in the country, Congress passed the Low Income Housing Preservation and Resident Homeownership Act ("LIHPRHA"), 12 U.S.C. §§ 4101 *et seq.* LIHPRHA provided incentives for building owners to sell their properties to non-profit organizations or tenant cooperatives, rather than removing their low-income tenants and renting at market rates.

In the 1990s, residents at the Carmen-Marine complex formed the Carmen-Marine Tenants' Association. The association applied for, and received, a $23.1 million LIHPRHA grant from HUD which it used to buy and refurbish the building, eventually turning over ownership to CMC. Residents in the building could then purchase memberships in CMC, with each membership corresponding to occupancy of a unit in the complex. Under the terms of the HUD grant, LIHPRHA was to administer sales of memberships in a particular way and to remit particular proceeds from membership sales to HUD. Per an audit by HUD's Office of the Inspector General, CMC has largely failed to abide by the terms of the grant.[3]

---

[3] OIG Audit Report, *supra* n. 2, at 1 ("[CMC] did not ensure that [any of seven grant criteria were met]. As a result, HUD and the Cooperative lacked assurance that the project was operated in accordance with HUD's requirements and the grant agreement, and the Cooperative is at risk of having to reimburse HUD nearly $22.7 million in Program funds.").

At some point, Mara purchased a membership in CMC and became a resident at the complex. And at some point in 2025—exactly when is unclear, although it appears to have been around August—Michael moved into Mara's unit. Witnesses in certain body-worn camera videos that the Tiquezes submitted to the court have indicated that, at the point Michael moved in, Mara was living in a separate residence outside of the complex. After he moved in, and apparently as a result of reading the HUD OIG audit mentioned above, Michael began "investigating the [CMC] Board's finances," the results of which investigation he "reported to HUD OIG." ECF 24 at 2.

On November 4, 2025, the president of the CMC board of directors, defendant Stella Popa, directed another board member, defendant Diana Molina, to deactivate the key fobs that the Tiquezes used to enter both the building and Mara's apartment.[4] Michael alleges that the deactivation was due to some combination of discrimination against he and his mother's Jewish and Latino heritage and retaliation for the investigation he had been running into the board.

On November 28, 2025, Michael went to the building and, on being denied entrance, called the police. Officer Danny Yu and

---

[4] The body-worn camera videos attached to the complaint seem to indicate that only Michael's and not Mara's key fob was deactivated, but that ends up being immaterial.

Sergeant Mandy Tucker—both of the Chicago Police Department, and both defendants—responded. Michael did not gain entrance or the reactivation of his fob. On December 1, 2025, Michael again returned to the complex and again called the police. He did not gain entrance or reactivation. At each of these visits, Michael explained his position to the police. Police then heard from CMC Board members Anca Neciu and Luminita Dragos (both defendants) and Vanessa Williams, an employee of Forth Group, the Carmen-Marine complex's management company (Forth and Williams are also defendants). These defendants told police, as recorded on the officers' body-worn cameras, that they had deactivated Michael's fob because: (1) his mother, and not he, was the proper occupant of the residence; (2) Michael had been acting erratically, as if he were in mental distress or under the influence of narcotics; and (3) he had thrown eggs out of the window of the unit at a maintenance person who was working from a platform suspended high above the ground.[5]

---

[5] For better or worse, plaintiff can supplement, and supplant, his complaint with video footage he provides alongside it. *Bogie v. Rosenberg*, 705 F.3d 603, 611 (7th Cir. 2013).

On December 1, 2025, Michael filed suit in Cook County Circuit Court.[6] Michael's complaint petitioned for preliminary injunctive relief granting him access to the apartment and then pled several causes of action that resemble those here. It is my understanding that, whether in the context of that case or one to be filed after its conclusion, CMC will be attempting to evict the Tiquezes.

Those are the facts on which the Tiquezes have based their complaint. To recap, the defendants are:

- Carmen Marine Cooperative, the tenant-run non-profit which owns the Carmen-Marine complex
    - Stella Popa, CMC Board President
    - Luminita Dragos, CMC Board Member
    - Diana Molina, CMC Board Member
    - Anca Neciu, CMC Board Member
- Forth Group, LLC, the management company for the Carmen-Marine complex
    - Vanessa Williams, a Forth employee
- The City of Chicago
    - Seargeant Mandy Tucker
    - Officer Danny Yu

Against all of these, plaintiffs have attempted to make out sixteen causes of action, eight of which fall under 42 U.S.C. § 1983 and eight of which correspond to other federal, state, and

---

[6] *Tiquez v. Carmen Marine Cooperative et al.*, No. 2025-CH-12045 (Ill. Cir. Ct. Dec. 1, 2025).

contract provisions. To the best of my understanding, the counts are as follows:

| The 1983 Counts | | |
|---|---|---|
| Count | Defendants: | Claim: |
| I | All but Chicago | Deactivation of the key fobs constituted an unreasonable seizure of property under the Fourth Amendment |
| II | All but Chicago | Deactivation of the key fobs constituted retaliation for the exercise of Michael's First Amendment right to report the results of his independent investigation to HUD's OIG |
| III | Tucker and Yu | Officers' failure to force CMC and Forth to reactivate the key fobs constituted an unreasonable seizure of property under the Fourth Amendment |
| IV | Tucker and Yu | After Michael explained his position to Tucker and Yu, they told him that further persistence might result in arrest, constituting retaliation in violation of his First Amendment right to call 911. |
| V | Tucker and Yu | Tucker and Yu's negative view of Michael's position, when contrasted with other officers' apparently-positive view, constituted a violation of his right to equal protection under the Fourteenth Amendment |
| VI | Chicago | The City's failure to train Tucker and Yu to treat Michael's situation more favorably constituted a violation of Michael's rights pursuant to *Monell* |
| VII | All but Chicago | Defendants conspired to deprive Michael of his constitutional rights in the previous counts |
| VIII | All | Defendants deprived Michael of access to the apartment by deactivating his fob without an opportunity to be heard, violating his rights to due process under the Fourteenth Amendment |

7

| The Non-1983 Counts | | |
|---|---|---|
| **IX** | All instant defendants | Deactivation of the key fobs constituted racially discriminatory interference with contract under 42 U.S.C. § 1981 |
| **X** | All instant defendants | Deactivation of the key fobs constituted racially discriminatory interference with property under 42 U.S.C. § 1982 |
| **XI** | All instant defendants | Deactivation of the key fobs violated CMC's use agreement |
| **XII** | All but Chicago | Defendants conspired to interfere with Michael's civil rights under 42 U.S.C. § 1985(3) |
| **XIII** | Forth, Williams, Neciu, Dragos | Defendants had knowledge of the conspiracy in Count XII but failed to prevent it under 42 U.S.C. § 1986 |
| **XIV** | All instant defendants | Deactivation of the key fobs violated plaintiffs' rights under the Fair Housing Act |
| **XV** | Williams, Popa, Molina, and Neciu | Defendants' statements to the police about Michael's behavior constituted defamation *per se* |
| **XVI** | All but Chicago | Various actions by defendants indicating that they would attempt to evict plaintiffs constituted intimidation under the Fair Housing Act |

The pending motion concerns only the instant defendants, while Chicago and the officers have not yet been served. The instant defendants move to dismiss every count which applies to them: I-II and VII-XVI.

## II.

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled

to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).

## III.

Plaintiffs have asserted many claims, but they can be grouped into three tranches, each of which turns on a single issue. I will deal with one preliminary and then turn to those three groups.

### A. Short and Plain Statements

Defendants' first contention is that I should dismiss the complaint as simply incomprehensible. Rule 8 requires that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and while *pro se* litigants' filings should be read generously, they must at least be intelligible. *Job v. Illinois Dept. of Human Servs.*, 2009 WL 255596, at *4 (N.D. Ill. Feb. 2, 2009). Defendants are right that the Tiquezes' complaint is neither short nor plain. But, while it may resist comprehension, it is not literally incomprehensible.

9

**B. State Action**

Counts I–VIII all assert claims pursuant to 42 U.S.C. § 1983. Section 1983 "provides a civil remedy against any 'person' who violates a plaintiff's federal civil rights while acting under color of state law." *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023). Any claim under Section 1983 requires that the defendant be, at least in some sense, a state actor, and the instant defendants insist that, as to Counts I, II, VII, and VIII, they are not. Their argument is simple: CMC is a private, non-governmental organization; Forth is a private, non-governmental organization; and Williams and the board members are private citizens.

The Tiquezes' arguments are more complicated. First, they contend that because CMC's purchase of the Carmen-Marine complex was funded by an FHA loan, and because HUD has ongoing oversight of that loan, CMC and its agent, Forth, are effectively government actors, meaning that Williams and the CMC board members, as their agents or employees or representatives, are as well. Second, plaintiffs seem to be saying that, because officers responded to the complex on November 28, 2025, and because those officers did not force CMC to reactivate the key fobs, they "ratifie[d]" the deactivation so as to retroactively make it state action. ECF 62 at 17. Or, in the alternative, the officers were conspiring with

10

CMC and Forth so closely as to make CMC and Forth (and Williams and the board members) *de facto* government actors on those days.

In general:

There are no hard and fast rules for determining the presence of state action. Indeed, the Supreme Court has emphasized repeatedly that the state action inquiry must be made on a case-by-case basis. Despite this emphasis on individual cases, certain generalizations are still possible. State action exists: (1) where the state and the private party or entity maintain a sufficiently interdependent or symbiotic relationship; (2) where the state requires, encourages, or is otherwise significantly involved in nominally private conduct; and (3) where the private person or entity exercises a traditional state function.

1 Nahmod, Civil Rights & Civil Liberties Litigation: The Law of Section 1983 § 2:4. But although extensive state funding or regulation of a private entity might constitute significant involvement, regulation and funding are, without more, not enough to turn private conduct into state action. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). This is because there must be some nexus "between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Id.*

In the first place, the instant defendants are correct that none of them is inherently a state actor. In the second, plaintiffs' initial argument fails. CMC was indeed formed through a $23.1 million LIHPRHA grant from HUD, and CMC is supposed to be bound by certain terms pursuant to that grant. But HUD clearly

does not control CMC, given that HUD's OIG has repeatedly found that CMC is *not* complying with the terms of its LIHPRHA grant.[7] More, the complaint does not suggest any nexus, any reason that CMC's having received HUD funding would have led to the deactivation of their key fobs. And in the third place, the Tiquezes have failed to plead that the officers were involved in the deactivation in any way.

The Tiquezes' main citation in this area is *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56 (1992). There, the owners of a trailer park decided to illegally evict Soldal, a tenant. *Id.* at 57–58. The owners called the Cook County Sheriff's department "and requested the presence of sheriff deputies to forestall any possible resistance." *Id.* at 58. Several deputies arrived and looked on as the owners hooked up a tractor to Soldal's trailer

---

[7] In addition to the HUD OIG audit cited in note 2, *supra*, CMC failed HUD OIG audits in 2016 and 2018, both of which plaintiffs cited in their complaint.

"Carmen-Marine Apartments, Chicago, IL, Resident Homeownership Program," HUD Office of the Inspector General, Audit Report No. 2017-CH-0001 (Oct. 25, 2016), https://www.hudoig.gov/sites/default/files/documents/2017-CH-0001.pdf.

"Carmen-Marine Apartments, Chicago, IL, Resident Homeownership Program," HUD Office of the Inspector General, Audit Report No. 2018-CG-0001 (Dec. 22, 2017), https://www.hudoig.gov/sites/default/files/documents/2018-CH-0001.pdf.

and towed it away, destroying it in the process. *Id.* One of the deputies explained to Soldal that "he was there to see that Soldal didn't interfere with [the owners'] work." *Id.* (cleaned up). The Tiquezes' argument seems to be that, like the sheriff's deputies in *Soldal*, Officers Yu and Tucker stood by while their property was seized, thus effectively participating in the seizure, making it state action.

That is mistaken. First, *Soldal* is not about state action. The question presented was whether seizing Soldal's home—without violating his privacy by looking inside—implicated the Fourth Amendment. *Id.* at 61–72. Second, that the state action in *Soldal* was so obvious as to be beyond dispute points up how different the situation there was from the one in this case. In *Soldal*, the sheriff's deputies participated directly, and told Soldal they were participating directly, in the seizure of his home. *Id.* at 58. Here, Michael called the police a month after his fob was deactivated and they, recognizing a civil dispute not within their province of action, did not act. That does not retroactively convert the fob deactivation into state action. Likewise, nothing on the officers' body-worn camera footage indicates anything to the contrary, much less that they conspired with any of the instant defendants to deactivate the fobs.

Plaintiffs have failed to state a claim as to Counts I, II, VII, and VIII.

### C. Racially Motivated Interference

In Counts IX and X, plaintiffs allege that the instant defendants interfered with their contractual and property rights for racially motivated reasons under 42 U.S.C. §§ 1981 (contract) and 1982 (property). In Count XII, plaintiffs have alleged that the instant defendants, along with Officers Tucker and Yu, conspired to effect the interference in Counts IX and X under 42 U.S.C. § 1985(3). In Count XIII, they allege that Forth, Williams, Neciu, and Dragos were aware of the conspiracy and neglected to prevent it under 42 U.S.C. § 1986. In Count XIV, they allege that the instant defendants interfered with their rights under the Fair Housing Act under 42 U.S.C. § 3604(b) & (f). And in Count XVI, they allege that the instant defendants, Tucker, and Yu engaged in intimidation, coercion, and interference prohibited by another section of the Fair Housing Act, 42 U.S.C. § 3617.

As best as I can tell, in each count except XVI, the Tiquezes are referring to the deactivation of the key fobs. In that last count, they are alleging that certain statements made to Michael during his visits to the Carmen Marine complex were intimidating or coercive. And in each count but XIV, they are alleging that defendants' actions were motivated by racially discriminatory

14

intent. In that count, they allege discriminatory intent due to a disability of Mara's and Mara and Michael's national origin, rather than their race.

As defendants have detailed at length, each of these provisions comes with its own set of elements which plaintiffs must make out in order to state a claim for the purposes of Rule 12(b)(6). Each share one element though, which is that to state a claim, a plaintiff must plead facts connecting whatever harm they have suffered to their race (or, in Count XIV, their disability and national origin) by way of defendants' intent to discriminate on that basis. *Black Agents & Brokers Agency, Inc. v. Near N. Ins. Brokerage*, 409 F.3d 833, 837 (7th Cir. 2005) (Section 1981); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616–17 (1987) (Section 1982); *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002) (Section 1985(3)); *Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1089–1090 (7th Cir. 1982) (42 U.S.C. § 3604(b)); *Roseborough v. Cottonwood Apartments*, 1996 WL 490717, at *1–*2 (N.D. Ill. Aug. 26, 1996) (42 U.S.C. § 3604(f)); *Bloch v. Frischholz*, 587 F.3d 771, 781–82 (7th Cir. 2009) (42 U.S.C. § 3617).

The only exception to that rule is Count XIII, which alleges that some defendants neglected to prevent a conspiracy formed by other defendants. That count lives or dies with Count XII, which alleges the conspiracy itself; if there was no conspiracy, then no

15

one can have neglected to prevent it. *Grimes v. Smith*, 776 F.2d 1359, 1363 n.4 (7th Cir. 1985).

Plaintiffs have failed to plead facts which would, for any of these counts, connect their alleged harms with defendants' discriminatory intent. They have pled that they are Jewish and Latino, but they have not pled that defendants knew of their race or religion or ever manifested any evidence of discrimination related to them.[8] As for Count XIV, they have pled that Mara had unspecified health problems, but not a disability, and they have not pled that defendants were aware of it or failed to accommodate it. Likewise as to that count, they have not pled a single fact about their national origin.

Every explicit statement defendants have made in the documents and body-worn camera footage that plaintiffs have referenced in and attached to their filings has related not to plaintiffs' race, national origin, or disability, but Michael's

---

[8] The Tiquezes have gestured towards a theory wherein the CMC board is dominated by people of Eastern European descent and that the board has delayed renting to people of Eritrean and Latino descent. *See* ECF 24 at 8–9. But they failed to connect a theory about the board's Eastern European affiliations with the action specifically at issue, meaning the fob deactivation. And such a connection is necessary, considering that the board allowed Mara not just to rent but to buy a membership in CMC and that its alleged discriminatory feelings did not prompt it to attempt to remove Mara at any previous point in her occupancy.

16

behavior. Plaintiffs maintain that those statements are all false, but they have not pled any facts showing that defendants were motivated by anything else.

Without such facts, plaintiffs have not stated a claim at Counts IX-X, XII-XIV, or XVI.

### D. State Claims

The remaining counts, XI and XV, concern state claims. Count XI alleges a violation of the Carmen-Marine complex's Use Agreement, which lies in contract. And Count XV alleges defamation, which lies in tort. Given that I am dismissing all federal claims relating to the instant defendants and given that the state claims relate only to the instant defendants, I decline to exercise supplemental jurisdiction over those state claims. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

### VI.

I grant the pending motion and dismiss Counts I-II and VII-XVI as to the instant defendants. As this is the first dismissal, it is without prejudice.

If plaintiffs are inclined to ask leave to amend, I would advise them that the Rules of Civil Procedure apply to *pro se* as well as counseled litigants and that when Rule 8 says "short and plain," it really does mean both short and plain.

17

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge
Dated: July 1, 2026